All right, Mr. Myers. Good morning, Your Honor. I'd like to reserve two minutes of my time. Eric Myers, McCracken, Stemmerman, and Halsbury for UNITE HERE International Union. The events that gave rise to the major disputes in this case are the following. Sky Chefs made three changes to the established terms of employment. So, sorry, we don't have a lot of time, and we've read the briefs, so can I just jump right in? Absolutely. You have argued that many of these changes were violations of the agreement and thus trigger this being a major dispute. Do you only need to win on one of them to trigger it being a major dispute, or do we parse them one by one and figure out whether – do we have to decide all of them if we think any one of them is a violation of the contract? This is a question of the court's subject matter jurisdiction. If the employer, Sky Chefs, made any change in the existing terms and conditions of employment, then the district court had subject matter jurisdiction to enjoin that change. So, yes, you only need to find one of these. Would the injunction then only enjoin that one change, or would the injunction have to put everything back to the status quo? I believe the – we haven't briefed that, obviously, but I think that it would be sufficient that the injunction pertain to the change at issue. If there was a unilateral change without the bargaining Section 6 process or the arbitration process that the parties agreed to, then the injunction would be to restore that particular action. And so then that means we do need to reach every issue because the injunction would go issue by issue, and we have to figure out which ones violated the agreement? There's subject matter jurisdiction if any of them. We believe all of them did, but it would be sufficient if the court found one of the changes to give rise to a major dispute. Perhaps I'm not being clear. But then who decides what the scope of the injunction is? In the first instance, normally it would be the district court exercising it. So you think we should just say there was subject matter jurisdiction here because it would be sufficient for you if we just say one of them and leave the rest undecided and then send it back to the district court to decide whether other ones were also violations? Is that what we should do? I'm not being clear. I think that the court should decide all three because these are important questions in order to give the district court direction as to the scope of the injunction, certainly. But it would be sufficient at a minimum for the court to have subject matter jurisdiction were one of the three, after you examine all three, were one of the three to give rise to a major dispute. I'm not sure I understood your answer to my colleague's question. If I understood her question correctly, she's saying we've got three issues you've raised. If we found that only one of them, hypothetically, only one of them was violated, that would be a major question. But in so doing, would that allow the district court to consider the other two issues? Or would they be foreclosed because they're minor? Well, no. I think that the question is before this court right now to decide all three. My question is if, hypothetically, if we decided two of them adverse to your position, one of them in favor of your position, and it went back to the district court, would the district court only apply the major question to the one we decided in your favor, or would the district court have the ability to treat the other two that we view as minor disputes as part of the subject matter? Do you understand what I'm asking? I do think, and it does come to a question that wasn't briefed, what does a district court have, what's called a reverse boys market injunction, the ability to maintain the status quo in terms and conditions while something is being arbitrated? That decision has not been determined by the Ninth Circuit and wasn't really at issue here. So you don't know what the answer is? Well, we would. I know what you argue. Yeah, we would argue. Just to make it still more concrete, because I had the same question. So hypothetically, if we decided that the change in wages was not arguably justified by the CBA, and thus that presents a major question, but that the changes to the health plan were at least arguably justified by the CBA, it would be strange to say, well, one of them gets litigated in court, but then you have to go to the arbitrator on the other, and there would be parallel proceedings. How would that work? Well, I think that you raise an important question. I think that the court could order an injunction of the, certainly at a minimum, the court has to enjoin the major change, the major violation. I think within the scope of that, the court may shape the injunction to reach all three. I think there is certainly precedent for that in the reverse boys market injunction scenario. But at a minimum, the court has to enjoin the major change, restore the status quo with respect to that change. And because of the nature of these three changes that they made, I think ultimately if the employer is required either to pay the higher wage rate or to allow employees to opt out per the express agreement, or to not make the, to institute the redesigned plan altogether, it's going to have the same effect, because the employer made these changes as sort of a package way to drive through what it wanted to do. So I think that the practical effect would be to enjoin all changes, because as I say, the employer needed all three things to work lockstep to accomplish what it wanted to accomplish. So from your perspective, regardless of the normal practice and how this would be handled, in this case, you believe that the changes were so interlocked that even if we just found one was a violation in a major dispute, that inevitably you have to deal with the other two because they're inextricably part of the same thing. Is that your position? That is my position. Is there case, it sounds like you are, you do know of case law on this. I know it wasn't briefed, but I'm wondering if we should get supplemental briefing. Like if we ask for supplemental briefing, would there be something helpful to say? Yeah. Courts applying the Railway Labor Act, although not in this circuit, have applied a reverse Boyce Market injunction theory to it, wherein they say we are going to enjoin changes until the arbitration process is completed. That is not universally accepted. I'm not, that's not been the case in the Ninth Circuit to my knowledge. That is, I don't think it's been decided one way or the other in the Ninth Circuit to my knowledge. But I think there is something to say on that issue. Let me ask you a slightly different question here. When you look at the contract, it refers to wages and other benefits. They're kind of like a package. Arguably, that could be done within the contract, but it also refers to the fact that the change, the increase, if you will, had to be announced by both the company and the union. Obviously, that did not happen here. Is that part of the contract requirement sufficient to throw this into a major category, even though you've got a combination of wages and benefits together? Well, it's not been our primary argument, obviously. Our argument has been that they only have, it's a one-way ratchet. They can raise wages, and they chose to raise wages. They cannot unilaterally decrease wages. Now, there is this additional provision that it is supposed to be announced by both parties. That has not been in all honesty. Actually, let me clarify this. A dollar is a dollar. So from their perspective, just arguendo, they say, well, the wage may have been reduced here, but we pay more of the insurance. And when you combine the packets together, they actually came out better, dollar for dollar. What's your response to that? Two things. A dollar is not a dollar in this context because over time, wages get calculated on the actual wage rate and all these other benefits that accrue based on the wage rate. But the term and condition of employment, if you look at Shoreline, Shoreline says we have to look at the practical realities of what the employment conditions are. And in this case, the employment condition is that these employees get a certain amount of money on their check that they have total liberty to decide what to do with. Nobody would say, well, I'm getting the same amount. I'm getting a wage of $100,000. Oh, it turns out it consists of this, this, this, and this. No, the wage is a term of employment because you have the liberty to do with it what you will. So for those reasons, this sort of equivalency, well, you're getting the same dollar here, you're getting the same dollar there, is not an equivalency. And for the people who had spouses or families, they didn't even come out ahead is my understanding of your argument? Well, certainly, so with the contribution rates, with the new LAX plan, the family, employee plus spouse, employee plus children categories all went up, so absolutely. The price of the insurance went up. So the total amount of compensation seems to have gotten worse for them essentially. Absolutely. What we call the copremium, the price you have to pay on your weekly paycheck to purchase the insurance. Can I ask one other question to clarify your argument? So I think when you summarized the points today that you were making, dropping the one plan was not in your list. Have you stopped arguing that that was a violation of the contract to drop the consumer, I can't remember what it's called, the consumer choice plan or whatever it was, the plan that they got rid of altogether? Well, if I didn't raise it right here, it wasn't because I'm dropping it. The whole redesign, and I intended to talk about the arbitration requirement to redesign the plans, but the whole redesign of this plan consisted of dropping one of the plans, creating a new plan or an enhanced plan, they used different words at different times to describe what they did, and to alter the economics of that plan in terms of all kinds, not just in terms of the copremium, the contribution rate, but in terms of the coinsurance rate. It's an 80-20 plan. It's more expensive for certain deductible categories and so forth. All of that was a plan redesign, and all of that. Oh, I see. I thought you had like dropping the plan and then plan redesign of the other one as like two things, but you're saying it's sort of all one thing. I think most meticulously speaking, when they say, because their argument is we had this copay plan, we took the copay plan and we enhanced it. And so narrowly speaking, addressing that argument, I say you redesigned it, and by redesigning it you had to arbitrate because you made a clear commitment to arbitrate, and that commitment is reflected in Section 2-7 of the Railway Labor Act. You cannot act in contravention to those commitments. More broadly speaking, they made a change in what I call the structure of the agreement. The structure of the agreement is we have these two plans, consumer-driven health care and copay plan. Everybody gets to participate in them, and everybody gets to decide to opt out if they choose. That's the decades-long structural agreement. Let me suggest this. Let's go over a bit of time. We're going to give you time to rebut, and my colleagues will have more questions. I apologize. But why don't we hear from the other side, and then we'll give you a chance to come back and respond again, okay? Thank you, Your Honor. Good morning. Good morning. May it please the Court. My name is Daniel Shamas, and I represent Sky Chefs in this dispute. We just heard a lot of good-spirited arguments as to why the changes that Sky Chefs chose to do may violate the agreement. However, the union's burden is much greater. They have to show that we basically have no argument, that our arguments are frivolous, in bad faith, and our burden is actually very light. A light burden is the way the courts have described our burden to simply show that it's possible that we have a good-faith basis in the agreement itself. So let's just go to the first question I asked your opponent. If we disagree with you, I understand that you think we shouldn't, but if we disagree with you at least as to one of the changes, what does that mean as to the remedy and what happens next? Yeah, although it wasn't briefed, my instinct would be that it would make sense for the court to go to all the changes and say which ones were major, which ones were minor, and then remand it to the district court, and the district court would have jurisdiction over only the major dispute and then the minor dispute, and the court could probably say, well, we'll hold these in abeyance until I decide this. This may be on an expedited route. Arbitration sometimes takes a little longer in terms of selecting the arbitrator and going through that. So I think the two could be parallel, and the court would be cognizant of making sure that its jurisdiction is not impeded. So, okay, I'm a little surprised to hear you say that because, say, hypothetically, the one that we think is the biggest violation is the decrease in dollars paid. So you're saying what we should do is order you to go back and pay the extra $5 or whatever, but in the meantime, you're also still continuing on with the better, on your view, better insurance? You have to do both? Well, it would be our choice, I suppose. So we could withdraw it. We'll go back to the district court to decide if it's a major dispute, so who's right, who's wrong. But wait, if we say that it is a major, it was a violation, so we have a major dispute, wouldn't the district court have to follow that? Okay, yeah, so in that sense, yeah, and so that would end that, and then we would have the decision of whether or not we wanted to just return everything to the status quo ante or whether or not we wanted to just say, well, maybe we could do something else within that. We could pay the higher wages. That's your gut feel. I understand you say you don't have any case law. Yeah, we haven't briefed that. I had a question raised by my colleague. You're not sure, it sounds like we probably need supplemental briefing on that issue from both parties to tell us what law there may be out there on the issue. Yeah, but I would like to use seven minutes to try to persuade you guys that the wages that we increased the buy, we could also decrease the buy, and the reason why is because the only thing that the company did was the company complied with a living wage ordinance, which required that it pay at least, I think it was $5 to $5.67 in health benefit wages. Can I give you a hypothetical? So say Pasadena decides we have a minimum wage, $20 an hour, so you increase the, I guess you're in Burbank, but okay, so Burbank, whatever. You increase your wages to $20, and then the city decides actually, you know, too many restaurants are going out of business. We're making it $19, and you lower it to $19. You're saying you haven't lowered wages? I'm saying that our lowering the wages does not violate the MNA, and that's the CBA. That's the question. Is what we're doing violating the collective bargaining agreement? I guess I don't understand why, like, the reason you did it to comply with some law or other has anything to do with whether, in fact, you lower the wage from $20 to $19, and that violates the agreement. Okay, so there are two things on that. The first thing is that, again, the company decided how it wanted to comply with the living wage ordinance, and there were two things it could do. One thing it could do is it could just increase the cash wages by $5 or $2.67, depending on whether or not they opted in for the insurance. The second way, which is the way it's doing now, is it could increase the benefit. So increasing the health benefit is, therefore, at least arguably, it is putting the employees in the same exact position. Maybe not, well, I want to buy an Xbox, or I want to, you know, go to Las Vegas, but it's at least saying, hey, we're giving you $100 more in health insurance benefits versus $100 in cash. The living wage ordinance says you have to do either one. Right, so the living wage ordinance is happy, but that doesn't mean that this M&A is happy. Well, the M&A is silent. The M&A doesn't have any opinion about it at all. It doesn't talk about whether or not we have to pay an extra. We still comply with the M&A at all times. But it does say that you're supposed to negotiate the rates of pay with the union, right, not change them unilaterally. I mean, except for the provision that says you can change them unilaterally by raising them unilaterally. Yeah, although that provision does not say you can't decrease, it says you can't decrease them, it just says you can increase them, but it doesn't say whether or not you can decrease them or not. Well, I mean, it's a pretty strong implication, isn't it, that there's one provision says you have to negotiate, one provision says you can unilaterally raise. It would make no sense that it's silent and you can unilaterally lower them. Like I said, if the law, like in your Honor's example, if the law says that the minimum wage is now $100 an hour, and you're like, oh, God, what are we going to do? I guess we have to pay it. And then a week later they repeal, never mind, we're stuck with it now until we go back and bargain it. I don't think so. I think that as long as you're complying with the law at all times and the M&A, you're complying with the M&A as well. Why is that? I mean, like if we have a bout of inflation and you find yourself having to raise wages a lot, and then the next year we have deflation and you say, gosh, this is uneconomical, you might want to lower them. There are reasons that businesses legitimately want to raise and lower wages from time to time, but the M&A doesn't let you do that in one direction without negotiating. Well, but as long as, again, you're complying with the law at all times, I think it's the exact same thing. At least, again, it's arguable at least. I don't think that it's clearly a frivolous position to say that if you comply with the LWO in one direction and then you decide to comply with it as well in a different direction, that you're clearly violating the M&A, which doesn't even mention the LWO. It's silent on that. So we at least have a good-faith, non-frivolous position, and based on that, we are not clearly violating the M&A. It's not a major dispute. I want to be sure I understand one thing clearly. As I understand it, SkyShift is in a number of different jurisdictions, not just Los Angeles. Yeah. Was the change that we are talking about made only in Los Angeles with respect to the airport and a few other places? Yes. Or does it apply in other places where you do business? It's my understanding it's just complying with the Los Angeles because of the LWO. So everybody else in the system has exactly what they had before? Correct. And so those plans still exist? Like, if the court were to order you to go back to the status quo, it would be possible because, like, that insurance plan still exists. It's not like the insurer is out of business or something. No, there's, like, open enrollment and things like that, so I'm not exactly sure if we can, like, on a dime, like, just put everyone into the CDHP plan or give them that option. So I'm not sure about that, but it is definitely a local, a single change. And I think, if I understood correctly, this all happened, like, sort of in parallel with nationwide bargaining over whether there be a different agreement. Is that, has there been any progress, or is that still ongoing? I believe that's still ongoing. So just to conclude, I wanted to address not only the wages, but then also the issue about plan design and their argument that, well, this is just a change to plan design, which requires bargaining, and we can't do it unilaterally. Plan design is the only provision in the MNA that we arguably, even arguably violated because we just went in and did it. But plan design does not necessarily mean the changes we made are, quote, unquote, plan design. There's a lot of other types of changes that could also mean plan design. What about the concept of the people who want to opt out of health insurance? If I understand correctly, they didn't have that choice anymore based on the changes that were made in L.A. Is that correct? It's correct that if they decline to make an option, they're automatically enrolled in free health care. So that's the punishment. They get free health care. But if they want to opt out, they can still do that in L.A.? Well, they can decline if they want to, but we're going to enroll them anyway in free health care. And that will affect their wages? No. Well, they won't get the extra $5. They were never going to get that. Well, if they were not taking the health insurance before, they were getting more money. Correct. Right. So everyone's going to lose that. Everyone's going to get more health benefit wages, and we're going to comply with the LWO that way. So the way we look at it is that you don't have to participate in the new health insurance, but you're enrolled. In other words, you don't have to, like, make claims. You don't have to pay a deductible. You don't have to recognize. You don't have to go only in network doctors. You don't have to participate in it, but you're enrolled in it. So that is at least an arguable basis. I thought there was some way of going to the city and proving that your spouse had insurance. That's another way. That is a way to totally not even be enrolled in it is to get a waiver through the city to show alternate coverage. But certainly no one's forced to participate in anything. They just have free health care if they choose in six months or circumstances change. In fact, you were starting to talk about the definition of plan design. And I'd like to know what you think the definition of plan design is, but I'd also like to ask, it seems like the co-pays changed. And I'd like to know where you think the MNA allowed you to change the co-pays. Well, so I think the co-pays all were reduced. Everything was reduced. I mean, that's what they're mainly complaining about. I mean, for employee only at least. Right, but not for everyone because not for the people with families. Yeah, so those weren't changed, though. Those were normal. Now, there may have been an increase just because that was part of, like, year to year. Like, we didn't control it. We didn't say, hey, we want you to raise it. The insurance company, though, has certain yearly changes, but they were similar. Everything is similar for other types of coverages. Okay, I didn't understand that to be the characterization of the facts. I thought that there were changes in the co-pays, changes in the out-of-network, like a bunch of changes in what people would pay. And so let's just take that unless you think that's really false, maybe as a premise. You're saying you didn't need permission for that? So in terms of contribution, the contribution rate, that's 100% in the employer's prerogative. There's no need. The MNA clearly says that. But I don't think a co-pay or an out-of-network, sorry, not the word contribution, like how much you're paying when you go to the doctor as opposed to how much your premium is. Right. I want to ask about how much you're paying when you go to the doctor. It seems like at least they say that changed for at least some of these people, and it went up. So what lets you do that? Okay, so, like, it's not us that made that decision. So the insurance company decides under this plan how much co-pays are, how much doctor's visits are, things like that. And what happened is that most, almost everyone went down. Now, some may have gone up, but that wasn't, I mean, that's just the way the plan. And that's not a plan redesign. No, definitely not. So a plan redesign can include such things as, like, okay, well, now we're going to have, like, a platinum package, a gold package, silver package, tiered kinds of plans. It could also be, like, we're going to now use HMOs or PPOs or an EPO. Or it could also be, like, involving an HSA with the plans. There are a lot of types of health insurance. It's obviously very, very complex and a lot of different moving parts. And certainly plan design can include all those things. And so arguably what Sky Chefs did wasn't a plan design, and it was just picking, using its prerogative to pick a new or enhance or provide better fringe benefits for its employees. And that's what it did. Okay, we're way over time, but do either of my colleagues have additional questions? All right, thank you very much. Okay, thank you. So we'll give your opponent two minutes to respond. Let's do keep it to that, okay? We could talk for a long, long, long, long time about these. I think we could, Your Honor. I will say that, first of all, the living wage ordinance doesn't dictate how the parties comply with it or how an employer complies with it. Can you go to this co-pay issue that we were just discussing at the end? So do you think the co-pays went up, and what do you think prohibited that? So the co-pays, just so we're using the terminology, the co-pays being the amount, the 80-20 versus 70-30, or are you talking about that? I thought that was contribution. So I'm talking about, like, you know, each time you go to the doctor, it's $20 or $25. I thought you said, like, that amount went up, and if you went out of network it was even higher and that it was even worse for the people with families or something like that, that the prices of using the health care went up. No, I'll be clear. The one thing that I believe is supporting the record that went up is the annual deductible. That's how much you have to pay out of pocket before anything kicks in. Okay, well, that's also sort of like that. It's like when you use the health care, you're paying more. And that for family coverage out of network, to be very technical. Okay, so then if that went up, where in the contract do you think it says that you couldn't, they couldn't, because he's saying, well, that was the insurer, not us. So what is your response? I simply, I, plan design. Plan design goes into, he provided additional examples of what might constitute plan design, but he doesn't argue that these are not plan design, or at least I don't think he can make a convincing argument. When you talk about the deductible, the annual deductible, when you talk about the office copay, when you talk about the coinsurance, 80-20 versus 70-30, that's the design of a plan. And simply because there may be other things that are design of a plan, that doesn't at all take that out of the clear language of the plan, of the MNA. That changes to design, the company may approach the union and say, we want to design the plan a little differently, we want to tweak it, we want to change it. You have to bargain, and if you can't agree, you have to negotiate. They just ran roughshod over that express language. So I don't know if I answered your question sufficiently. So like nationwide, these plans exist. And I think he's saying sometimes the insurer makes some tweaks. So say the insurer says out-of-network care goes from $1,000 deductible to $1,100 for this. You're saying has it been the history to negotiate that nationwide, if there's some change in the deductible amount? I'm unaware of there ever having been a change to the plan design in the ways that you described. So it would be a hypothetical. But the union's position certainly would be, if you're going to change the economics of the plan from what is the existing plan, that's a change in plan design, you have to come talk to us. And that's the arbitration provision, right? And that's the arbitration provision. Other questions by my colleague? All right, thank you both, counsel, for your arguments, very helpful. You may hear from us a request for some supplemental briefing on the issue that we all raised about major, minor. If we decide one one way and the other is the other way, how does it work? Thank you both for your argument. The case just argued is submitted.
judges: SMITH, FRIEDLAND, MILLER